IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| FREDERICK COLEMAN, et al., )<br>)<br>    Plaintiffs,       )<br>)<br>    v.                )<br>)<br>HYUNDAI MOTOR          )<br>MANUFACTURING OF ALABAMA, )<br>LLC.,                  )<br>)<br>    Defendant.        ) | CIVIL ACTION NO.<br>2:25cv236-MHT<br>(WO) |

**AMENDED OPINION ON HYUNDAI'S MOTION FOR SUMMARY JUDGMENT ON COLEMAN'S RETALIATION CLAIM[*]**

Plaintiff Frederick Coleman[1] brings this employment-discrimination lawsuit against defendant Hyundai Motor Manufacturing of Alabama, LLC, claiming that it violated 42 U.S.C. § 1981 by retaliating against

---

[*] This amended opinion replaces the opinion entered on April 13, 2026 (Doc. 76), *Coleman v. Hyundai Motor Manufacturing of Alabama, LLC.*, 2026 WL 999480 (M.D. Ala. 2026) (Thompson, J.).

[1] There are two other plaintiffs in this case; the summary-judgment motion against them will be addressed separately and later.

him when he complained of race discrimination.[2] Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Before the court is Hyundai's motion for summary judgment. For the reasons below, the motion will be granted in favor of Hyundai and against Coleman.

## I.   LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When "the record taken as a whole could not lead a rational trier of fact to

---

2.   Coleman initially also brought a race-discrimination claim, but he has since abandoned it. *See* -Pl.'s Br. Opp'n (Doc. 54) at 2 n.1.

find for the non-moving party," summary judgment is appropriate. *Id.*

## II. FACTUAL BACKGROUND

The facts, taken in the light most favorable to Coleman, are as follows.

### A. Hyundai

Hyundai operates a car-manufacturing plant in Montgomery, Alabama. As with many companies, it has a corporate ladder that employees can climb to reach the top. Opposite the promotion ladder sits the disciplinary process designed to address employee-performance issues.

As to the promotion ladder, Hyundai has several departments, and each department has the following ladder. At the first rung are 'team members,' who are assigned to work in teams of about six-to-eight in a department. Each team is supervised by a 'team leader,' the position on the second rung of the ladder. There are two positions on the third rung: 'group leaders' and

'specialists.'   Group leaders oversee a *group* of teams, including the leaders of those teams, that work in a specific area, such as the chassis area.   Specialists, as their name implies, specialize in a particular job--for example, purchasing or quality control.   They operate more independently, and, unlike many of Hyundai's other positions--which are often blue-collar assembly line jobs with late hours or night shifts--specialist positions are often white-collar jobs with a 9:00 a.m. to 5:00 p.m. schedule.

The final three rungs on the corporate ladder involve junior- and senior-management positions.   First, 'assistant managers' oversee an entire area of a department and directly supervise specialists and group leaders.   Second, 'managers' supervise the assistant managers and oversee an area of a department.   Third and finally, the 'Head of a Department' oversees the managers and supervises an entire department--for example, the General Assembly Department.

Hyundai has formal multi-step processes for employees seeking to climb the corporate ladder. Relevant here is the following six-step process for promotions to assistant manager or below.  First, when a position opens, the company creates an online post on its Career Opportunity Program portal; eligible employees may apply to that position through that post.  Second, once the application submission period ends, the Human Resources Department, also known as HR, screens applications and weeds out employees who are ineligible for the posted position.  Third, the remaining applicants "are required to respond to a questionnaire about their experience and skills or to take an assessment--depending upon the position for which they are applying."  Fletcher Decl. (Doc. 43-20) ¶ 4.  Fourth, a group of applicants with sufficiently high questionnaire scores is chosen to be interviewed by a panel.  The panel includes at least one representative from HR and one from the Hiring Department.  After the interview, the panel fills out a matrix that grades each candidate based on a combination

of factors including the applicant's interview performance, work history, work performance, and qualifications. Fifth, that matrix is given to the Hiring Department which then recommends an even smaller list of applicants composed of those "whose final [matrix score] is above an established threshold." *Id.* ¶ 6. Sixth and finally, the Hiring Department's recommendation is sent to HR for approval.

Opposite the promotion process is the disciplinary process. Hyundai's disciplinary process involves a series of progressively increasing punishments; the appropriate punishment is largely based on the nature of the employee's performance issue and his disciplinary history. Ordinarily, a supervisor will first respond to a performance issue by making a 'discussion planner.' A discussion planner is used to investigate the issue and start 'a conversation' between the employee and his supervisor about why the issue is happening, as well as how to fix it. Yet if the employee's performance issue is severe enough, or if he continues to have a milder

6

performance issue despite a discussion planner, his supervisor may take 'corrective action.' There are four escalating phases of corrective action ranging from Phase I (informal discussion) to Phase IV (decision leave). When a corrective action is issued, employees may appeal the decision. The appeal first goes up the chain of command, and, if upheld, Team Relations then collaterally reviews the appeal. That said, corrective actions are rarely reversed.

Internal complaints of discrimination (including retaliation) are handled a bit differently, through a five-step process. First, employees who wish to file a complaint of discrimination or retaliation are encouraged to inform Team Relations. Second, Team Relations then notifies the General Counsel's office of the complaint. Third, the Counsel's office then directs Team Relations to conduct a formal investigation and create a report of its findings. Fourth, the report is sent to the Employment Review Committee, which determines whether the complaint is valid. Fifth and finally, a senior HR

manager will discipline an employee found to have discriminated against another.

To keep track of its internal investigations, Hyundai has a document that contains the details of complaints of discrimination. While the Legal Department maintains the list, most director-level employees may request permission to access it.

### B. Coleman

Coleman, who is African-American, was hired as a team member in 2012 in Hyundai's car manufacturing plant in Montgomery, Alabama. In 2017, he was promoted to team leader in the General Assembly Department.

### 1. The 'Master Swann' Incident

Three years later, in October 2020, Dan Smith, a white assistant manager at Hyundai, made a racially derogatory remark to a group of mostly African-American employees, including Coleman.

8

While Coleman was on a break with a group of 30 to 40 other employees, Smith approached the group and stated that "Master Swann wants y'all inside."  Coleman Dep. (Doc. 43-18) at 20:6.  Smith was referring to Jeff Swann, a white manager in the General Assembly Department.  Many employees felt that the comment was inappropriate given the racial implication of referring to a white man as the 'master' of a group, the majority of whom were African-American.  But, because they feared retaliation, nobody in the group reported the remark.

About four months later, in February 2021, another Hyundai employee heard about Smith's remarks and reported the incident.  In response, Hyundai's Team Relations department investigated the incident.  It interviewed Coleman and a few other employees as part of its investigation.[3]

---

3. In the aftermath of the interview, Edward Daniels testified that two Team Relations members--Ta'Lon Brown and Michael Finley--warned him to "be careful because [he has] got a dot on [his] back."  Daniels Dep. (Doc. 53-2) at 43:16-44:3.  Coleman testified that Daniels relayed this warning to him.  *See* Coleman Dep. (Doc. 43-18) at 82:6-84:23.  Coleman maintains this is evidence of "retaliatory bias."  Pl.'s Br. Opp'n (Doc. 54) at 38

Two days after Team Relations interviewed Coleman about the incident, Swann issued Coleman a Phase III corrective action for using his phone on the production line. Coleman, however, was not using his phone, and the phone, instead, fell out of his pocket while he was rushing to cover an open station. Coleman appealed the corrective action, and Team Relations eventually reversed that disciplinary action.

About a month later, Swann and Smith were forced to resign due to unrelated performance issues, but their resignations did not end Coleman's troubles.[4] In October 2021, Coleman received several corrective actions, often at the behest of Bobbie Ford, an assistant manager, who

("[T]he record contains a strong volume of other evidence of retaliatory bias."). However, this account is inadmissible hearsay. Moreover, even if it were admissible, this warning came after Daniels spoke to Team Relations in response to the demand letter his attorney sent to Hyundai. There is no evidence--outside of Coleman's deposition--that the warning had to do with the investigation into the 'Master Swann' incident.

4. There is conflicting evidence in the record over whether Smith's resignation was because of unrelated performance issues, his use of racially insensitive language, or both.

was a friend of both Smith and Swann.  And, five months later, Coleman unsuccessfully applied to a specialist position in the HR Department.

### 2. The Letter of Complaint

By July 2022, Coleman was so upset with his treatment over the past year and a half, that he sent a letter to Team Relations.  The letter charged that he was being "discriminated [against] and picked on by [his] group leader [and] management team."  Coleman Letter (Doc. 43-18) at 58.  It also detailed several corrective actions that he felt were unfairly issued.  The letter did not specifically mention 'racial' discrimination.

After sending the letter, Coleman met with then-Head of the General Assembly Department, Phil Vessenmeyer. Coleman told Vessenmeyer that he was concerned he was being targeted by his management team.  Vessenmeyer told Coleman that if he wanted to be a group leader he should "stop with all these complaints and [see] what [he] can do to make [his] management team happy."  Coleman Depo.

11

(Doc. 53-1) at 62:11-13.   Over the following months, Coleman applied three more times for a promotion but was never chosen.

### 3. This Litigation

On November 17, 2022, Coleman and other Hyundai employees initiated litigation against Hyundai. Coleman claimed that the company retaliated against him for complaining of race discrimination.  He continued seeking a promotion after this suit was filed. Also, from June to October 2023, he was temporarily assigned to be a group leader to help fill in a vacancy.   *See id.* at 99:5-10.   Despite applying for a permanent promotion to that position, the company promoted someone else from another shift.   *See id.* at 100:23-101:2.

### III. COLEMAN'S RETALIATION CLAIM

### A. Procedural Background

As stated, on November 17, 2022, Coleman and other Hyundai employees filed a federal lawsuit in this court:

12

*Coleman v. Hyundai Motor Manufacturing of Alabama*, 2:22cv666-MHT (M.D. Ala.), which this court will refer to as *Coleman I*.  They asserted various claims of race discrimination and retaliation in violation of 42 U.S.C. § 1981:

On March 26, 2025, the court split *Coleman I* into three lawsuits.  *See Coleman v. Hyundai Motor Manufacturing of Alabama, LLC*, 2:22cv666-MHT, 2025 WL 915037 (M.D. Ala. March 26, 2025) (Thompson, J.) (holding that severance of the parties was proper).  The three cases are *Ingram v. Hyundai*, 2:22cv666-MHT (M.D. Ala.); *Trimble v. Hyundai*, 2:22cv235-MHT (M.D. Ala.); and *Coleman v. Hyundai*, 2:25cv236-MHT (M.D. Ala.), which the court will refer to as *Coleman II*.[5]

*Coleman II* is the case now before the court.  It has three plaintiffs: Frederick Coleman, Edward Daniels, and

---

5. The court has resolved both the *Ingram* and *Trimble* cases in Hyundai's favor:  *Ingram v. Hyundai Motor Manufacturing of Alabama, LLC.*, 792 F.Supp.3d 1268 (M.D. Ala. 2025) (Thompson, J.), and *Trimble v. Hyundai Motor Manufacturing of Alabama, LLC.*, 792 F.Supp.3d 1275, 1278 (M.D. Ala. 2025) (Thompson, J.).

Jimmy Williams.   Only Coleman's aspect of the case is before the court on summary judgment in this opinion.

### B. Discussion

Coleman's sole claim is that Hyundai violated 42 U.S.C. § 1981 by retaliating against him when he complained of race discrimination.  "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp.*, 168 F.3d 468, 472 (11th Cir. 1999).  As part of that prohibition, the statute forbids retaliation against individuals who complain of race discrimination.  *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008).

For employment contracts, § 1981 borrows from another statute the framework for analyzing retaliation claims: the antiretaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).  *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).  Under that framework,

14

a plaintiff must prove three elements.  First, he must show that he engaged in a "protected activity."  *Id.* Second, he must establish that the alleged retaliation he suffered was "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted).[6]  Third

---

6. In his complaint and briefing, Coleman split his single retaliation claim into two counts.  The first count was for a 'failure to promote' and the second was for a 'retaliatory hostile-work environment.'  This argument structure has caused confusion between the parties; in particular, it has caused them to argue over the elements required to prove a retaliatory hostile-work environment claim.  However, such a claim has the same elements as all retaliation claims.

In *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020), the Eleventh Circuit Court of Appeals explained when allegedly suffered conduct is actionable:

> "First, some events are substantial enough standing alone to be actionable.  These have sometimes been referred to as 'tangible' or 'adverse' employment actions.
>
> "Tangible employment actions consist of things that affect continued employment or pay--things like terminations, demotions, suspensions without pay, and pay raises or cuts ... .  A claim that an employee has suffered a tangible

employment action ... is sometimes referred to as a disparate-treatment claim.

"Second, mistreatment ... is actionable even if the mistreatment does not rise to the level of a tangible employment action, but only if the mistreatment is sufficiently severe or pervasive that it can be said to alter the terms, conditions, or privileges of employment. A claim based on this kind of mistreatment is often referred to as a hostile-environment claim. ...

"Third, mistreatment based on retaliation for protected conduct--for example, making or supporting a charge of discrimination--is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' ... [T]his retaliation standard protects employees more broadly--and is more easily satisfied--than the standard applicable to claims of discrimination."

*Monaghan*, 955 F.3d at 860-61 (quoting *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 68) (other citations and quotations omitted).

Therefore, there is no need to show a hostile environment to prove a retaliation claim: the analyses are distinct, and a retaliation claim is an easier standard to meet than a hostile-environment claim. The sole issue presented in determining whether the plaintiff suffered an adverse action in a retaliation claim is whether the mistreatment well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

16

and finally, he "must demonstrate that '[his] protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gogel*, 967 F.3d at 1135 (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Coleman asserts three theories of retaliation: that he was retaliated against for his cooperation in the investigation of the 'Master Swann' incident; for sending the July 2022 letter of complaint; and for initiating litigation back in 2022.

### 1. The 'Master Swann' Incident

To begin, Coleman claims that Hyundai employees retaliated against him because he cooperated in Hyundai's internal investigation of Smith's racially derogatory remark. He states that in the days and months following the investigation he received several disciplinary actions from people connected to Swann and that he was repeatedly denied a promotion. The problem is that Coleman has not established that his interview with Team

Relations was protected activity--a necessary element to establish a prima-facie case of retaliation.

For § 1981 employment claims, the Eleventh Circuit Court of Appeals has looked to Title VII's antiretaliation provision to define protected activity. That provision contains two clauses: a 'participation' clause and an 'opposition' clause. *See* 42 U.S.C. § 2000e-3.

The participation clause prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.* "This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the [Equal Employment Opportunity Commission (EEOC)]; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). Coleman concedes that the

18

interview with Team Relations was not participation since it was not conducted in connection with the EEOC.

The opposition clause prohibits an employer from retaliating against an employee for his "opposition to conduct reasonably believed to be violative of ... § 1981." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997). To prove that he engaged in opposition, Coleman must show (1) "not only ... that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices," but (2) "also that his belief was *objectively* reasonable in light of the facts and record presented." *Id.* at 960 (emphasis in original).

For starters, it is unclear what unlawful employment practice Coleman asserts that he was opposing. His brief, for the most part, engages in generalities and conclusory comments. Under the heading "Coleman's retaliatory hostile environment claim," Pl's Br. Opp'n (Doc. 54) at 30, the brief states: "The 'Master Swann' comment ... came from a managerial level figure and the

context of the observation, a vilely paternalistic expression of racial privilege, could well indicate a discriminatory mindset by certain leadership at [Hyundai]: that is the essence of 'objectively reasonable' 'opposition to an unlawful employment practice.'" *Id.* The brief then continues: "Given those facts, Coleman engaged in protected activity within the meaning of § 1981. Coleman has presented sufficient evidence for his retaliatory hostile environment claim to advance to a jury." *Id*. at 31-32. While it is unclear, the court will assume that Coleman is contending that his interview with Team Relations was protected activity. To the extent that one racially derogatory comment followed by an investigation into it could create a racially hostile-work environment, Coleman has provided no evidence that he subjectively believed that he was opposing a business practice that violated § 1981 when he participated in the investigation of the 'Master Swann' incident. And even if he did satisfy the subjective prong, his belief would not be objectively

20

reasonable.   The court will address the subjective and objective elements in turn.

First, regarding his subjective belief, Coleman in his brief is not clear as to exactly what he was opposing with regard to his reliance on Smith's 'Master Swann' comment and Hyundai's later investigation into it, and the court has no independent obligation to search the record for evidence of Coleman's subjective belief.   *See Edwards v. Hyundai Motor Mfg. Alabama, LLC*, No. 2:07cv908-MHT, 2009 WL 1257164, at *3 (M.D. Ala., 2009) (Thompson, J.) ("The court, in considering a summary-judgment motion, [is] under no obligation to comb hundreds of pages of depositions in search of evidence contradicting arguments made by the movants." (citing *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996) ("Rule 56 ... does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition."))); *see also Chavez v. Sec'y Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict

21

court judges are not required to ferret out delectable facts buried in a massive record."). Alternatively, as a basis for finding that Coleman has not satisfied the subjective-belief element, the court would note that Coleman explicitly stated that he believed Smith's comment was "a joke." Team Relations Report (Doc. 43-19) at 8. And, in his depositions, when asked if he had complained to somebody about the 'Master Swann' incident, Coleman stated: "Actually we was called up [to Team Relations]. At the time, when the situation happened, when [Smith] first said it, I didn't complain." Coleman Depo. (Doc. 53-1) at 22:10–17. Admittedly, the Team Relations report includes other comments, but Coleman does not point to those comments to support his contentions, and, as stated, the court has no obligation to do this work for him.[7] *See Edwards*, 2009 WL 1257164, at *3.

---

7. Even had Coleman pointed to this other evidence in his brief, which he did not, he would still have needed to demonstrate in his brief that the evidence reflected that he subjectively believed he was opposing employment practices proscribed by § 1981.

Second, even if Coleman believed that he was opposing an unlawful business practice, his belief would have been objectively unreasonable.  "The objective reasonableness of an employee's belief that [his] employer has engaged in an unlawful employment practice must be measured against existing substantive law."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).  Here, Coleman discussed only Smith's comments and related events during his interview, and not any tangible employment policies, and, moreover, in the heading to his brief framed his argument about the 'Master Swann' incident as "Coleman's retaliatory hostile environment claim."  Pl's Br. Opp'n (Doc. 54) at 30.

But a belief that Smith's comments were enough to show Hyundai violated § 1981 by creating a racially hostile-work environment is objectively unreasonable. "[T]o hold an employer responsible under [§ 1981] for a hostile environment created by a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment in question and failed to

23

take prompt remedial action." *Little*, 103 F.3d at 959. While Smith's comments were racially derogatory, there is no evidence that Hyundai "knew or should have known of the [comments] in question and failed to take prompt remedial action." *Id*. The comments went unreported for several months, and once they were reported, the company quickly conducted the very investigation in which Coleman took part. Therefore, the context of the situation in which Coleman made the comments that he asserts reflects his oppositional conduct--his participation in the Team Relations investigation into the 'Master Swann' incident--manifests that the company took prompt action to investigate the incident once it learned of Smith's comment.

Alternatively, to the extent Coleman believes that he was opposing a racially hostile-work environment more generally, this belief also fails to amount to protected activity. While Coleman may have subjectively believed that he was opposing an employment practice that violated § 1981, the belief would have been objectively

24

unreasonable on the facts presented. Again, he has produced no evidence that Hyundai knew of any practices that violated § 1981 and "failed to take prompt remedial action." *Little*, 103 F.3d at 959.

Accordingly, Coleman fails to show that he engaged in protected activity regardless of the underlying facts he relies on in asserting a racially hostile-work environment that violates § 1981.

## 2. The Letter of Complaint

Next, Coleman submits that he was retaliated against because of his July 2022 letter "alleging that he was being targeted for unfair discipline." Pl.'s Br. Opp'n (Doc. 54) at 12. He contends that, after he submitted that letter, Hyundai retaliated against him by denying him a promotion. Once again, however, he has not produced enough evidence to establish a claim of retaliation.

First, there is the question whether Coleman has shown that his July 2022 letter was protected activity. Section 1981 prohibits race discrimination solely, and

therefore, to be protected activity, any opposition must indicate that the opposed conduct was racially motivated. *See Little*, 103 F.3d at 961 ("It is well-established that § 1981 is concerned with *racial* discrimination in the making and enforcement of contracts." (emphasis in original)). Coleman's letter does not *expressly* mention race; nor does it refer to the 'Master Swann' incident or investigation. Coleman also did not give such an indication during his meeting with Head of General Assembly Vessenmeyer.

However, as is almost always true, context matters. In his letter, Coleman charged that he was being "*discriminated* [against] and picked on by [his] group leader [and] management team." Coleman Letter (Doc. 43-18) at 58 (emphasis added). Whether one could reasonably assume that a reader of the letter, knowing that it had been written by an African-American within the context of employment, would know that the writer likely meant 'discriminated against because of race' is a question this court need not reach. For, even if the

26

letter were protected activity, Coleman has not shown that it was the but-for cause of his failure to be promoted.

For starters, Coleman has produced no evidence that Vessenmeyer, or anyone who knew of his letter, was involved in the hiring process, let alone was a decision-maker in that process. "To demonstrate a causal connection, the plaintiff must show that (1) the decision-maker knew of [his] protected activity, and (2) the protected activity and adverse action were not wholly unrelated. A plaintiff satisfies this first element by showing that the decision-maker was aware of the plaintiff's formal complaint prior to the adverse-employment action. When the protected activity and the adverse action occur in close proximity, a plaintiff can generally establish the second element concerning relatedness." *Dixon v. DTA Sec. Servs.*, No. 20-12040, 2021 WL 5320987, at *3 (11th Cir. Nov. 16, 2021) (internal citations omitted). Coleman has produced no evidence that the decision-maker who denied him a

27

promotion knew of his letter or his conversation with Vessenmeyer. Nor is there evidence that the decision-maker had access to Hyundai's list of complaints of discrimination or that Coleman's letter was part of that list.

Even further, Coleman has not rebutted the nonretaliatory reasons that Hyundai gave for its selections. An employer may refuse to promote an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019). "[F]ederal courts do not sit to second-guess the business judgment of employers." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (citation omitted). And, therefore, when an employer gives a legitimate, nonretaliatory reason for its decision, "the employee must confront the employer's

28

seemingly legitimate reason ... 'head on and rebut it.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).

Coleman applied to two positions after he submitted his letter in July 2022, and Hyundai gave reasons for its selections of three individuals over Coleman.  First, he applied to a General Assembly group leader position in August 2022; the company submits that it chose Monshikki Bonner for that position because of her relevant experience, "leadership skills, positive attitude, and willingness to assist her team."  Davis Decl. (Doc. 43-25) ¶ 4.  Another General Assembly group leader position became available in October 2022, and those who applied to the previous listing--including Coleman--were considered for this opening.  *See* R. Brown Decl. (Doc. 43-23) at 17-19.  The company submits that it chose Latarence Brown for this position because of his relevant experience, "attention to quality," and "leadership skills."  *Id.* ¶ 4.  Second, Coleman applied to an Engine

29

Quality Control group leader position in October 2022. The company asserts that he was ineligible for the position because he scored a 'D' on the matrix. And the company represents that it selected Marquetta Brown for a litany of reasons related to her skills, personal qualities, experience, and relationships with others.

While Coleman makes two arguments in response, neither rebuts Hyundai's reasons for its selections.

First, Coleman argues that Hyundai did not give legitimate, nonretaliatory reasons for its selections. He asserts that it did not give reasons for why *he* was *not* selected but that it only gave reasons for why *other* employees *were* selected. He is mistaken; as when the company gave its reasons for selecting the chosen candidates, with those reasons it also gave legitimate, nonretaliatory reasons for why he was not selected. *See Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1341-42 (11th Cir. 2000) (finding that an employer gave a legitimate, nondiscriminatory reason for its selection when it gave a reason for why another employee was

selected), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003); *see also Trimble v. Hyundai Motor Mfg. of Alabama, LLC*, 792 F. Supp. 3d 1275, 1281 (M.D. Ala. 2025) (Thompson, J.) ("[W]when the company gave its reasons for selecting the chosen candidates, with those reasons it clearly also gave legitimate, nondiscriminatory reasons for why [the plaintiff] was not selected.").

Second, Coleman provides statistical evidence that he believes shows the promotion decisions were part of a coordinated practice of retaliation. He asserts that he and three other Hyundai employees who filed suit against the company alleging race discrimination collectively submitted 72 applications for various promotions over roughly four years. The company selected someone who did not complain each time.

Coleman's statistic is riddled with errors. For one, many of the applications involved positions for which the employees were ineligible or were submitted before they complained of discrimination. Therefore, Coleman's

31

assertion that he and three other employees who complained were collectively denied promotions 72 times is quite misleading. He also has not provided an analytic foundation for his statistic, and therefore, it is "virtually meaningless." *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir. 1991). "To say that very few [applicants who complained of race discrimination] have been selected by [Hyundai] does not say a great deal about [Hyundai's] practices unless we know how many [of those applicants] applied and failed and compare that to the success rate of equally qualified [applicants who did not complain]." *Id.; see also Trimble v. Hyundai Motor Manufacturing of Alabama, LLC,* 792 F.Supp.3d 1275, 1280 (M.D. Ala. 2025) (Thompson, J.) ("The problem is that Trimble offers no evidence to back up his allegations of a pattern of racial discrimination. He has not provided employee files, resumes, or job applications (outside of those for which he and two other employees applied). Nor has he produced demographic data about the employees in Hyundai's various departments or who applied to the

32

specialist or leadership positions. The only supporting evidence is Trimble's own beliefs. But '[a] mere belief of the existence of a fact is not evidence of that fact.'" (quoting *Ingram v. Hyundai Motor Manufacturing of Alabama, LLC.,* 792 F.Supp.3d 1268, 1274 (M.D. Ala. 2025) (Thompson, J.))).

### 3. This Litigation

Coleman pursues a third and final theory: he represents that he did not receive a promotion because he sued Hyundai in 2022. While filing a § 1981 lawsuit is a protected activity and being denied a promotion is an adverse-employment action, Coleman's last theory still has a problem: he has not established but-for causation.

Coleman asserts that from the beginning of June 2023, to the end of October 2023, he was filling in as a group leader. He explains that during that time he did very well, and several other group leaders were rooting for him. However, Hyundai did not select him for the

33

full-time role for this position; instead, the company selected a leader from another shift.

The problem here is that Coleman provides no evidence that his lawsuit was the reason he was not promoted.

For starters, October 2023, when the selection was presumably made, was nearly a year after Coleman filed suit, and, therefore, it is too long for temporal proximity *alone* to establish causation.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("But mere temporal proximity, without more, must be 'very close.'" (*quoting Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))).  The Eleventh Circuit has held that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough" to be considered temporally proximate.  *Id.*  Therefore, Coleman cannot rely on temporal proximity to meet the burden of

Moreover, there is no evidence regarding the selection process that would allow the court to analyze whether Coleman has otherwise met his causation burden.

**34**

Coleman has not shown who the decision-maker was for the position, whether that person had knowledge of the lawsuit, or what that person's selection criteria were. He has also failed to provide comparator evidence regarding who was selected and what their relative qualifications were. As a result, there is no way to know why the chosen job applicant was selected over Coleman. Indeed, it is an open issue as to whether the chosen applicant had also filed a complaint or lawsuit. Finally, Coleman has not even shown that he was eligible for the promotion.

In essence, Coleman's assertion that his being passed over for the promotion was retaliatory is without any back-up evidence other than that many of his supervisors liked him. His final theory therefore fails too.

## IV. CONCLUSION

Because Coleman has not produced enough evidence for a jury to reasonably find that Hyundai retaliated against him in violation of § 1981, the company's

35

summary-judgment motion should be granted in its favor on Coleman's claim.  However, because there are two other plaintiffs with claims in this case, the court will not enter a final judgment on Coleman's claim at this time.

DONE, this the 20th day of April, 2026.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE